State of Missouri, *ex rel.* Lyne S. Metcalf, Respondent, *v.* Ferdinand L. Garesché *et al.*, Appellants.

### April 24, 1877.

1. Where the duty of a ministerial officer is plain and unequivocal, courts will, at the instance of one who has a right to have the duty performed, issue a writ of *mandamus* to compel him to do it; but where there is a doubt as to the right or power of the officer to perform the alleged·duty, the writ will be denied.

**2.** Where a question of fact is involved in a *mandamus* proceeding, which must be decided before the duty of a ministerial officer can be ascertained, the officer will be compelled to solve the question if he can, but, where he is powerless to command evidence necessary to a correct solution of the question, courts will make a judicial examination and ascertain the fact for him.

**3.** Where, in a *mandamus* proceeding, the relator alleges it to be the duty of the canvassing officer to make and certify a certain return as the result of an election, and the officer makes return to the alternative writ that the poll-books now show a result different from that alleged, but that he has reason to, and does, believe that the figures on the poll-books showed, when returned to his office, the result alleged by relator, and that since coming into his hand certain figures have been changed and altered so as to give the opponent of relator a majority of votes, and that he is about to certify the result as now shown by the poll-books, contrary to his belief as to the fact, courts will make an examination and ascertain the fact, and compel him to make a certificate in accordance therewith.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

*A. R. Taylor*, for appellant, cited: McCrary on Elect. 64, sec. 82; The State *ex rel. v.* Steers, 44 Mo. 223; Morgan *v.* Quackenbush, 22 Barb. 77; Const. Mo., art. 6, sec. 1; The State *ex rel. v.* Bailey *et al.*, 7 Iowa, 404; Barnes *et al. v.* Gottschalk *et al.*, *ante*, pp. 111, 222; The People *ex rel. v.* Fuller, 29 Ill. 420, 422; The State *ex rel. v.* Dougherty, 45 Mo. 300; Wag. Stat. 569, secs. 25, 29.

*W. B. Thompson*, for appellant, cited: The State *ex rel. v.* Steers, 44 Mo.; *Ex parte* Bacon *v.* Lyon, 6 Cow. 392; *Ex parte* Nilson, 1 Cow. 423; Dixon *v.* Judge, 4 Mass. 286; The King *v.* Archbishop of Canterbury, 15 East, 117; The King *v.* The Justices of Kent, 14 East, 395; The People *ex rel. v.* Supervisors of Albany, 12 John. 44; Ewing *v.* Thompson, 44 Pa. St. 376; The People *v.* Haas, 25 Ill. 328; Husselman *v.* Rems, 41 Pa. St. 401; McCrary on Elect., sec. 83, and cases cited; Brown *v.* Hixon, 45 Mo. 350; Hadley *v.* City of Albany, 33 N. Y. 603; Clark *v.* Buchanan, 2 Minn. 346; Morgan *v.* Quackenbush, 22 Barb. 79; Hunter *v.* Chandler, 45 Mo. 453; Bland *v.* Rodman, 43 Mo. 260; Hunter *v.* Chandler, 43 Mo. 257.

*Hitchcock, Lubke & Player*, with *Henderson & Shields*, for relator, cited: McKay *v.* Underwood, 47 Mo. 185; Reid *v.* Piedmont, etc., Ins. Co., 58 Mo. 429; *In re* Strong, 20 Pick. 495; The People *v.* Rivers, 27 Ill. 242; The State *v.* Lafayette County, 41 Mo. 224, 225; The State *v.* Steers, 44 Mo. 226, 227; The People *v.* Ohio Grove Town, 51 Ill. 195; Commercial Bank *v.* Canal Comrs., 10 Wend. 31; Society *v.* The Commonwealth, 52 Pa. St. 125, 133; The Queen *v.* Southampton, 1 B. & S. 25; The State *v.* Dougherty, 45 Mo. 298, 299; Kisler *v.* Cameron, 39 Ind. 488; Clark *v.* Kenzie, 7 Bush, 523, 527, 528; Bell *v.* Pike, 53 N. H. 473, 474; The State *v.* Gibbs, 13 Fla. 55; Wag. Stat. 569, secs. 24, 25, 29; The State *v.* Lawrence, 3 Kan. 95; Dunklin County *v.* District County Court, 23 Mo. 454; The State *v.* Bailey, 7 Iowa, 394; High on Rem., secs. 32, 33, 55, 56, 60, 63, 472.

BAKEWELL, J., delivered the opinion of the court.

This was an application for a *mandamus* to compel appellants, as canvassers of election returns, to issue to the relator a certificate of election as representative for Congress, in the Third Congressional District. An alternative writ issued, and was served upon defendant Garesché, clerk of the County Court of St. Louis County, and upon defendants Finney and Shultz, justices of the County Court.

The petition alleges that, at a general election in St. Louis County, held on November 7, 1876, relator and R. Graham Frost were candidates for Congress, in the district named; and that the poll-books of said election, duly returned to defendant Garesché, showed that relator received 8,097 votes, and Frost 8,072; that the poll-books of Precinct 57, when received by Garesché, on November 8th, showed, certified to relator, 318 votes, and, to Frost, 272 votes, and were so read and called off by Garesché, to many persons, on that day; that on November 9th this return was fraudulently altered by some person unknown to relator, the figure " 7 " being changed into a " 9," so as

to make the votes for Frost read "292;" that Garesché, after investigation, on November 14th, pronounced himself satisfied that this change was made after the returns were delivered to his official custody; that on November 16, 1876, Garesché called to his assistance the other defendants to aid him in casting up the returns at said election; and that Garesché, by law, is required to certify the result of such canvass to the secretary of state, who thereupon issues to the candidate having the highest number of votes a certificate of election, which is the evidence of title to the office; that defendants, knowing that said returns have been fraudulently altered, as aforesaid, in the office of the county clerk, illegally and oppressively refuse to count Frost's vote at Precinct 57 at "272," and have counted his vote as "292," thus giving him a majority of votes; that defendant Garesché, whilst defendants were canvassing these votes, informed the other defendants that he was satisfied that the number of votes on the poll-book of Precinct 57, when received in his office, was 272, and not 292, for Frost, and that the same had been fraudulently altered, and proposed that said vote should be counted 272, but the other defendants decided to count said vote as 292; whereupon, Garesché announced that he would adopt their decision, and would so certify to the secretary of state; that defendants, against relator's objections, will so certify, and that the effect will be to deprive relator of his certificate of election, contrary to truth and right, unless prevented by the court; that defendants have not finished the canvass, and are still in session as canvassers of said election; and that relator has no other adequate legal remedy, and prays a *mandamus* to command defendants to count the vote of Frost in Precinct 57 as 272.

Defendants Shultz and Finney, in their joint return to the writ, deny all fraud and oppression, and knowledge of any alteration of the poll-book, and say that, as canvassers,

they counted the vote of Precinct 57 as 292 for Frost, according to the face of the poll-book presented to them, as was their duty. They say that Garesché told them that there were circumstances from which he was led to believe the poll-book had been changed as alleged in petition; but said he had no personal or official knowledge of the fact, and furnished the poll-book to these respondents showing a return and certificate of 292 votes for Frost in Precinct 57, which they counted accordingly, as they were bound by law to do. The answer further says that they had completed the canvass of returns before the writ was served.

The separate answer of Garesché denies all charges of fraud and oppression; denies that he ever read off or called the number " 272 " from the poll-book as the vote for Frost in Precinct 57; admits that he investigated a public charge that the vote had been fraudulently altered from " 272 " to " 292 " on the poll-book of that precinct; and says that he stated, and still believes, that the change was made, as stated, in his office, and after he had footed up said returns from a tally-sheet in his office, in which he had counted the figures in question as " 272 ; " says that he was advised by counsel that he could not change the figures to " 292 " unless he knew of the fact of the alteration of his own knowledge, but that he should, if he believed from circumstances which have come to his knowledge since the alleged alteration that the " 7 " had been changed to a " 9," state on his return his belief in the alteration. He denies that he ever said that he would adopt the count of 292 except accompanied with this statement of his belief. He denies that he ever directed, or assented to, the making of a tally-sheet of the vote with these figures set down as 292.

The answer further alleges that he has no personal or official knowledge of any change in the figures; that, from circumstantial evidence elicited by him, he believes the change was made as alleged; that it was not made by his

consent or authority, or with his knowledge, and, as he believes, not by any of his subordinates, and that it was not made by him.

A motion for judgment on the return was overruled. The cause was then tried by the court, a jury being waived.

The evidence is extremely voluminous, and its perusal leaves no doubt upon the mind that the poll-books as returned to the office of the county clerk at nine o'clock on November 8th, the morning after the election, showed the vote for Frost at Precinct 57 to be 272, and that for Metcalf, 318; and that afterwards the vote for Frost was changed to 292. Everybody who had any official connection with the poll-books was examined as a witness.

Garesché testified that he had examined the " 9 " in the poll-book with a magnifying-glass, and believed it was changed from a " 7 ; " that, on the day the poll-book was returned to his office, he had made various calculations which appeared on a tally-sheet introduced in evidence, made in his office from the poll-books, which were all correct if this figure was then written on that sheet " 7," and all wrong if it was written " 9 ; " that this tally-sheet was not seen by him again until November 13th, when he found it under a blotter on his desk, and was at once struck with the fact that, in the Frost vote in Precinct 57, the " 7 " seemed changed to a " 9 " by a pen which had been once used for red ink, and then dipped in black; that he then went over the calculations again, and found them all right if this figure was " 7," and all wrong if it was " 9 ; " and he was then convinced that the tally-sheet and poll-book had both been changed.

Young, a deputy in Garesché's office, swore that he had entered the figures " 272," and not " 292," on this tally-sheet, on the day after election, from the numbers as called to him by Brewer, another deputy, and that Brewer, on that day, called out the numbers of Precinct 57 to the newspaper reporters from the poll-book.

Brewer's testimony as to these facts corroborated that of Young. He further swore that the "9" on the poll-book had been changed from a "7" in paler ink, as was apparent under the magnifying glass; and that the figures on the tally-sheet were originally "272," and were correctly transferred from the poll-books by himself and Young, and were called out from the poll-books to the reporters by himself.

Vogel, another deputy of Garesché, testified to receiving the poll-books of Precinct No. 57 from the judges of election, on the morning after the election; also that he verified Garesché's calculations on the tally-sheet, on the evening of November 8th, and found them correct; also that the poll-books were in a room inside the county-clerk's office, and accessible to persons interested in the election, till November 9th, when attention was called to the alleged change in the returns.

Houser, the publisher, and Bohle, the collector, of the *Globe-Democrat*, swore that Garesché, on November 8th, gave them the vote for Frost at Precinct 57, from the poll-book itself, as "272" — a memorandum produced at the trial being made by Bohle at the time.

Benedict, reporter of the *Republican*, swore that he took the figures "272" from Brewer's call in the clerk's office, on the day after the election; and a question arising at the newspaper office as to its correctness, he returned at once to verify the numbers, which he did from the tally-sheet, where he found them "272." He swore that the "7" had been changed on the tally-sheet to a "9" since he looked at it on that day.

Kargau, reporter of the *Anzeiger*, and Todt, reporter of the *Westliche Post*, also swore that they took their figures from Brewer's call from the poll-books and tally-sheets in the clerk's office, on November 8th; Frost's vote in Precinct 57 was then given as "272."

Springmayer and Ahlbrandt, two judges of election at

Precinct 57, and Hartedt, one of the clerks, all swear that the vote for Frost was "272," and so written on the poll-books when the box was sealed up.

Foster, United States deputy marshal, was in the room when the vote was counted by the judges of election; copied the vote on a poll-book blank, from the call of one of the judges, for Wenderly, the supervisor of election, and then on another blank for his own use. Frost's vote was "272."

Wenderly, United States supervisor, corroborated Foster, but had no recollection of the exact vote for Frost or Metcalf, except as derived from the book prepared for him by Foster.

Norris, a policeman on duty at the precinct, was present when the vote was counted and called out; remembers distinctly the vote was, "Metcalf, 318; Frost, 272." A poll-book was made out by the officers of election at Precinct 57, and delivered to witness on the night of the election with the results written out; he took this to headquarters, according to orders, and it has been missing ever since the second day after election, though diligently sought for.

Allen, chief United States supervisor of elections for this district, made a return as supervisor, based on the return made by Wenderly to him. This return was, "Metcalf, 318, and Frost, 272." The testimony of this witness was excluded on the objection of defendants, as the return was in the handwriting of Allen's clerk.

For the respondents three witnesses were introduced.

McAlpine, one of the clerks of election at Precinct 57, who had no recollection as to the vote for Frost, could not swear whether the "7" was changed to a "9" by him or not; all the figures in the poll-book were in his hand.

John M. Hennessey, one of the judges of election, was called, but had no recollection as to Frost's actual vote. His testimony was wholly unimportant in chief. Examined by the court, he testified that, at the request of the other

judges, he took the box containing the poll-book to his bed-room the night of the election, where it remained sealed up, and was touched by no one until next morning at nine, when he delivered it, at the county clerk's office, to the clerk.

O'Connell, another judge at Precinct 57, did not recollect the exact vote for Frost or any candidate ; nor did he state whether the actual return made on the book was " 272 " or " 292," or what it was.

No other witnesses were introduced on either side. A copy of the poll-book and the original of the tally-sheet, spoken of by the witnesses, were then offered in evidence and admitted. On the tally-sheet the figure in " 292 " is manifestly a " 7 " converted afterwards into a " 9 " by a curl added with a pen to the horizontal stroke of the " 7."

Many instructions asked by defendants were refused, and instructions asked by relator were given ; and a peremptory *mandamus* was issued, commanding respondents, as election canvassers, in examining and casting votes at Precinct 57 for representatives in Congress, to cast the vote as 272 for R. Graham Frost and 318 for Metcalf. From this decree defendants appeal.

That Garesché had good reason to believe that these figures were altered in his office after the poll-books came there, is indisputable ; that he did believe so is not disputed ; that the fact was so, the testimony adduced in the Circuit Court, if human testimony has any value, plainly shows. But the fact remains that, though Garesché believed the figures were altered — recognized in himself, perhaps, a moral certainty of the fact — he did not, at the time of the service of this writ, know it with that knowledge which utterly removes all possibility of doubt. He had no appliances at his command for examining witnesses, taking testimony, and sifting the matter to the bottom. It must, after all, have been clear to him that, whilst all appearances pointed to a change in these figures since they came into his custody, a judicial inquiry might show that these appear-

ances were deceptive. Up to the moment that he found the tally-sheet on his table, he was strong in the persuasion that the figures had not and could not have been changed in his office. That circumstance, which might not have convinced others, convinced him. It was not, perhaps, entitled to the weight which he gave to it, but it produced a revulsion in his mind. Up to that moment he was sure that the figures were changed before they came into his custody ; after that time he became equally assured that the change had been made after he had received the box. As the matter stood, there was room for a reasonable doubt as to whether the figures were or were not those which were on the poll-books when deposited with him. The matter could not be determined with certainty without examination, and that examination he was confessedly incompetent to make. He could neither summon witnesses nor compel them to answer. Now, if he could not make this examination, was it in the power of the Circuit Court to make it for him ? If so, the relator was entitled to the remedy he sought in this proceeding, and the judgment must be affirmed ; if not, he is the subject of a grievous wrong for which he has no remedy at all : of a grievous wrong, because, although the title to the office cannot be at all passed upon in this proceeding, and *mandamus*, even when used to place a person in possession of an office, confers no right, yet the possession of the office belongs by law to that candidate whom the poll-books show to have the highest number of votes. And the real question must always be, What were the numbers on the poll-books at the time they were delivered to the canvassing officer? For, we apprehend, it will be claimed by no one that, if Garesché had carefully noted these figures when the books arrived, and they had been afterwards changed under his eyes, he could have been bound, in canvassing the vote, to take the altered figures rather than those originally on the poll-book.

The clerk certainly cannot inquire into, and has nothing

whatever to do with, any errors that occur before the poll-book reaches his office. He cannot conduct a contested election in any case. He is bound to presume in favor of the integrity of the return at the time that he canvasses the vote, and cannot certify to anything but the face of the return, unless he knows it has been changed. But the question may arise, as in this case, What was the return as it came to his custody? He is a ministerial, and not a judicial, officer, and he has no judicial discretion in canvassing returns ; but it by no means follows that he has no discretion at all, and becomes a mere unreasoning machine. Questions may arise which the canvassing officer must decide at his peril. Where figures are ambiguous, he must interpret them. And what the figures were that came to his office is not absolutely determined, in every case, by the appearance of the figures when he writes his certificate. Suppose the poll-books had been seen by himself and copied by twenty clerks on Saturday night, and on Monday morning, through the falling of a drop upon the page, the action of acid, or a blot, the tail of a " 9 " had disappeared, converting it into a cipher ; is he to certify the figure as it was, and as he knows it ought to be, or as it is by the injury of the elements or the accident of a night? And if he has a serious doubt, how is it to be resolved? And if the investigation of facts is necessary to resolve the doubt, are we to be told that he must act with a doubtful conscience, certify for a fact what he believes to be a lie, and that the courts have no power to compel him to act, or must compel him to act in uncertainty, and that they cannot first make his way plain for him and then command him to proceed?

That the clerk, as a canvasser of votes, is a mere ministerial officer and has no. judicial functions whatever, but must accept without question, and simply count, the returns, is settled law. The statute provides (Wag. Stat. 569, sec. 25 ) that the clerk of each County Court shall, within eight days after the close of each election, take to his assistance

two justices of the peace of his county, or two justices of the County Court, and examine and cast up the votes for each candidate, and give to those having the highest number of votes a certificate of election. "There is no discretion given," says Judge Wagner in *The State* ex rel. v. *Steers*, 44 Mo. 228, "*no power to pass upon and adjudge whether votes are legal or illegal;* but the simple ministerial duty to cast up and award the certificate to the person having the highest number of votes. If the clerk has sufficient mathematical ability to correctly count up the returns, he is perfectly qualified for his office, for that is the only duty devolved upon him by law."

Undoubtedly; but he must know what the returns are before he can cast them up; and to this extent he must have discretion. He cannot go behind the returns, but he must know what are the returns that came to his office. He has nothing to do with fraudulent votes, nor with changes in the books before they are left with him; but between two books, both claiming to be the poll-books left in his custody, he must decide, if such a question arise. He cannot count as a return what he knows not to be a return, nor count as a figure what he knows to be no part of the return made to his office, but something that has been put in its place since the books came there.

In approving the bond of the sheriff as collector, the justices of the County Court act in a purely ministerial, and not at all in a judicial, capacity, and yet they have a discretion in examining the sufficiency of the security. It is their duty to hear evidence as to the sufficiency of the bond; and a peremptory *mandamus* will issue to the County Court in the matter of the approval of such a bond. *The State* ex rel. v. *Lafayette County*, 41 Mo. 225.

A jury commissioner is a purely ministerial officer; yet he must decide on the sufficiency of an excuse offered to have a juror stricken off the list. And where the nature of the excuse and the duty of the officer are plainly defined by

statute, when the truth of the facts relied upon is fairly shown, he will be compelled by *mandamus* to strike off the juror's name.   *The People* v. *Taylor*, 1 Abb. Pr. 200.

*The State* ex rel. v. *Dougherty*, 45 Mo. 300, was a case in which a county treasurer made return to the alternative writ of *mandamus*, directing him to show cause why he should not make payment to the School Board, that he did not know how much of the fund remained in his hands.   The court told him that it was his business to know — that he must inform himself at his peril; that the court would neither investigate the matter for him nor direct him to pay any specific sum; but that it would require him to pay over the actual balance in his hands, the ·amount to be ascertained by himself.   And the court warned him to see to it that he rendered an accurate return.   Who can doubt that, if in that case the doubt and uncertainty had necessarily and inculpably arisen from the circumstances of the case, and the means of information were beyond the reach of the respondent, the court itself, before issuing the peremptory writ, would have furnished the respondent with the machinery of the law proper to set on foot an investigation, and arrive at a determination of the fact?

"*Mandamus* does not lie to guide the discretion of inferior tribunals, but it is emphatically a writ requiring the tribunal or person to whom it is directed to do some particular act appertaining to their public duty, and which the relator has a legal right to have done." *Dunklin County* v. *District Court*, 23 Mo. 454.

The act must be in its nature a ministerial, and not a judicial, act; and it must be quite plain that the act ought to be performed.   This being so, the court, at the instance of one having a right to have the thing done, will compel the officer to do his duty.   The court will not guide the discretion of a judicial officer.   Nor will it ever interfere in a doubtful case, where there is room for discretion in the proper sense of the word; because, if discretion is to be

exercised, it is the discretion of the officer to whom it is committed, and not that of the superintending tribunal. The court cannot supplant the discretion of the proper officer by its own. But, where there is a plain duty, a pretended discretion cannot be interposed as a reason for refusing to perform the duty. The fact that one has been a fire-warden exempts him, we will say, from jury duty. He brings to the jury commissioner complete, proper, and uncontroverted evidence that he has been a fire-warden. The jury commissioner refuses to regard his evidence, or to give it any effect, and will not strike him off the list. An application is made for a *mandamus;* the facts appear as clear as day; there is no room for argument; there is, therefore, in a strict sense, no room for discretion; there is nothing to sift, and there can be no sifting — *no discernment;* and the court, without hesitation, orders the ministerial officer to perform his clear duty, and to strike off the name. (*Discretio,* from *discerno,* from *cerno,* to sift.)

If, as is said in the case at bar, the poll-books as returned to the office of the county clerk showed that relator had a majority of legal votes for the office of representative in his district, it was the duty of the canvasser to certify that fact, and he had a right to the certificate. When required to show cause why they should not so certify, respondents answer that they do not know whether the poll-books as deposited in the clerk's office showed a majority for relator or not; and the respondent, Garesché, who is by law the custodian of those books, says he believes they were altered in his office so as to give the majority to the opponent of relator; that he has no personal knowledge of the fact, and was therefore about to certify to the face of the poll-books as they stood after the fraud had been committed. This fraudulent alteration, though made without any complicity or fault of his, was, according to the belief of respondent, avowed in his answer, perpetrated in his office,

and whilst the books were in his custody. And he not only states his belief in an alteration, but in the precise alteration charged by relator in his petition — that "272" was changed to "292" in the vote for Frost at Precinct 57. So far as there is any room for an exercise of discretion here, it would seem to have been exercised. The respondent Garesché does actually *discern* between this "292" apparent now upon the books and the "272" said to have been there when they came into his hands, and says the "292" is wrong, and that "272" is the true number. Nevertheless, as, by further answering that he is going to certify to the number that he believes to be wrong, the respondent would seem to say that he has not been able to push the inquiry to a result entirely satisfactory to himself, and as he has no means of prosecuting a judicial inquiry into a disputed fact, the court pursues the inquiry for him, and, having ascertained the fact beyond a doubt, it then directs the ministerial officer to proceed at once to perform a duty which has now, at least, become quite plain. And we do not know upon what principle, or on what authority, it can be said the court exceeds its power in this. Certainly there is here no pressure upon the conscience of the clerk; and if *mandamus* should be denied, in view of the evidence in the case, he could no longer hesitate how to act, and the result must be the same; knowing that the number returned to his office was "292," he has no discretion to certify it as anything else.

We are referred to a case in Iowa which is claimed by counsel for appellants as decisive of the question that the Circuit Court has no such power as was exercised in the granting of this writ. We have looked at the case, and we do not think it has the force which appellants claim for it. It certainly does not decide that, as between a true and false return, the canvassers have no discretion to decide which is true. On the contrary, it concedes that they have this discretion; for that is precisely what the canvassers did

in the case cited, and it is held they had the power to do it. Nor does it say that, when the canvassers are unable to decide between the returns, the court will not take evidence; for the canvassers had decided and acted when the court was applied to for the writ.

The case is *The State* ex rel. v. *Bailey, County Judge, etc.,* 7 Iowa, 393. An election was held for a county seat. The canvassers counted the vote for one precinct as forty-three. It was claimed by relator that this vote was altered from "fifty" to "forty," and should have been counted "fifty-three." The canvassers declared the result in favor of Forest City, and the county judge, the respondent, so entered of record, and declared Forest City the county seat. An alternative writ was issued against the county judge and others; what the prayer of the writ was does not appear. On the trial, evidence was introduced that the returns had been altered after they had been sealed up by the judge of election and directed by the board of canvassers. This evidence was objected to, on the ground that the court could not receive evidence that was not before the board of canvassers. A peremptory writ was awarded; and this order was reversed by the Supreme Court, on appeal.

The court says that any *tribunal* constituted for the trial of a contested election, when trying the ultimate question of right, may go behind the returns. "On the other hand, the duty of *canvassers* is to receive the returns, count the votes, and either to declare the result or certify the numbers to another board of canvassers. So far their duty is ministerial, as it is often said to be in the books, and they have no discretion. But it is not always so. The case or the point may arise when they may exercise their judgment or opinion. Therefore their duty is sometimes said to be not altogether ministerial. Ex parte *Strong,* 20 Peck, 444. Such we conceive to be the question on the word 'forty,' whether it was 'forty' or 'fifty.' *Here they must exercise*

*judgment, opinion, discretion.* They had no evidence before them other than the return, and upon this they decided.''

Now, certainly, this case is not parallel with the one before us. And it has not been contended by counsel for relator in this case that, had the respondents, the canvassers, acted — examined the votes and made the return — he would have been entitled to the writ, or that he could then have taken testimony in a proceeding of this nature, as to whether or not the figures which had been counted and returned as '' 292,'' were not '' 272 '' in fact.

The court then uses the following language: ''If the District Court, or this one, were acting upon the final question which town were chosen — if it could, under this proceeding, pronounce conclusively between them — if it did not have to act upon and through the canvassers, it could properly hear testimony showing the alteration in the record. And in truth we cannot say it was error to receive it, because it was nugatory. The court cannot command the canvassers to regard the word as ' fifty,' for it depends upon opinion, upon evidence ; upon opinion whether it is ' fifty ' or ' forty ' upon the face of the paper, and upon evidence whether it has been changed. If the court may control the canvassers upon this, then the order for the peremptory writ is not sufficient. They are ordered to count all the votes. But they say they have counted all. They should be directed to count fifty-three in favor of New Hampton from Deerfield. Nothing less than this will reach the point. But this the court cannot do, for it would be controlling their discretion, and perhaps commanding them to act against their convictions.''

The precise force of this language cannot be determined without a fuller understanding of all the facts of the case, and of the peculiarities of the Iowa law for the election of county seats, than I have been able to gather from the opinion. But it is quite clear that, whilst the court says —

following the received doctrine — that a contested-election case cannot be tried by a proceeding for a *mandamus*, it nowhere says or intimates that, if the canvassers had been about to certify " forty " instead of " fifty " on an application to command them to certify " fifty," testimony could not have been taken as to which was the true return of the clerk of election. It is true that it gives as one reason for refusing the writ in this case that " forty " or " fifty " rests upon evidence, and that evidence cannot be heard; but it does not say that evidence might not be heard under another state of circumstances. And, of course, it cannot control the discretion of the canvassers in a matter as to which it can have no information at all, and as to which, from the necessities of the case, they must know more than the court which is asked to direct them.

To say that to command the clerk to treat the return in the case before us as " 272 " may perhaps be commanding him to act against his convictions, in the face of his answer stating his belief that " 272 " was the return that he received from the clerk of election, would be absurd. But this, considered in itself, is not, perhaps, a valid objection to submitting an issue of fact, in a *mandamus* proceeding, to a tribunal authorized to try the fact; because it may be said that no one is permitted to be wiser than the law; and when a fact has been found by a competent tribunal, it must in all cases be recognized as a fact by all who are called upon to deal with it. Where there can be a reasonable doubt, however, and there is therefore room for the exercise of discretion, it is undoubtedly the province of the clerk to determine which is the true return, and the courts will not then interfere, unless the clerk refuses to act.

Where the duty of a ministerial officer is plain, the court will, at the instance of any one who has a right to have that duty performed, command him to do it. If there is grave doubt as to the right or power of the officer, against whom the writ is asked, to perform the alleged duty, the writ will

be denied; but where there is involved a question of fact merely, which can be solved by evidence or examination, the court will compel the officer to clear away the doubt, or, if that cannot be done, will itself investigate and decide. The duty of the canvasser is a pure matter of arithmetic, in that he can receive evidence of nothing outside of the returns themselves, but his preliminary duties in determining what is the return that he has to count may require the exercise of discretion, and partake of a *quasi*-judicial nature. High on Rem., sec. 56. Where such cases arise, and it is represented to the court that the canvasser is going to act, not only against the plain truth of the case, but against his own conviction, and the canvasser, in his answer to a writ, admits that he believes the fact to be against the certificate he is about to make, the court can compel him to act in accordance with the fact, and to make a true certificate. We have been referred to no case (and our attention has been directed to very many) which seems to militate in the least degree against the view of the law which we have intimated in this opinion.

We have given to the matter that careful consideration which the importance of the principles involved seems to demand, and as we see no error in the action of the Circuit Court in taking testimony as to the alleged change in the return after it was received by the clerk of the County Court, the return to which the canvassers must certify is that which the clerk of the County Court is shown to have received.

The judgment of the Circuit Court is affirmed. All the judges concur.